UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ENNIS LEE BROWN,

                        Plaintiff,

        v.                                    Case No. 16-cv-241-pp

JACOB GENNRICH, MARLON HANNAH,
MICHAEL HUBER, and MICHAEL NINKOVIC,

                        Defendants.

**ORDER DENYING DEFENDANTS' MOTION TO RESTRICT DOCUMENTS (DKT. NO. 172), GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 173), DENYING PLAINTIFF'S MOTION FOR VIDEO CONFERENCE (DKT. NO. 193), GRANTING PLAINTIFF'S REQUEST FOR STATUS OF CASE (DKT. NO. 199) AND DENYING PLAINTIFF'S REQUEST FOR ENTRY OF DEFAULT (DKT. NO. 200)**

        Plaintiff Ennis Lee Brown, an inmate at the Wisconsin Secure Program Facility who is representing himself, filed an amended complaint alleging that the defendants violated his rights in 2012 and 2013 when he was confined at the Milwaukee County Jail. Dkt. No. 10. The court initially allowed the plaintiff to proceed on claims based on six separate incidents, dkt. no. 11 at 8, but it subsequently granted the defendants' motion to dismiss unrelated claims and ordered that the plaintiff could not proceed on the amended complaint because it violated Federal Rules of Civil Procedure 18 and 20, dkt. no. 99. After giving the plaintiff two opportunities to file a second amended complaint that complied with the joinder rules, see dkt. no. 106 (reviewing procedural background), the court ordered that the plaintiff could proceed on Claim 1 from his amended complaint (dkt. no. 10, #5 at p. 5) that the defendants used

1

excessive force against him and failed to provide him with proper medical care on February 6, 2013, dkt. no. 106 at 4.

The defendants have filed a motion to restrict documents, dkt. no. 172, and a motion for summary judgment, dkt. no. 173. The court will deny the motion to restrict and will grant in part and deny in part the summary judgment motion.

The plaintiff also has filed motions asking about the status of the case and a motion for entry of default. This order addresses those motions.

## I.      Motion to Restrict Documents (Dkt. No. 172)

Along with their motion for summary judgment, the defendants filed a motion to restrict materials under General Local Rule 79(d) (E.D. Wis.). Dkt. No. 172. They ask to restrict to case participants and the court the plaintiff's medical records, and the documents that reference his medical records. Id. at 1. Specifically, the defendants seek leave to file the following materials as restricted to the parties and the court: (1) Defendants' Brief in Support of Motion for Summary Judgment, dkt. no. 174-1; (2) Defendants' Proposed Findings of Fact, dkt. no. 175-1; (3) Exhibit 1006 (Classification File), dkt. no. 183-4; (4) Exhibit 1011 (Jail Logs), dkt. no. 183-10; (5) Exhibit 1012 (Incident Reports), dkt. no. 183-12; and (6) Exhibit 1015 (Deposition Transcript), dkt. no. 184-2. Id. at 3. The plaintiff opposes the defendants' motion. Dkt. No. 186.

"Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." In re Specht, 622

2

F.3d 697, 701 (7th Cir. 2010). The Seventh Circuit has held that there is a general presumption that judicial records are public. Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 945 (7th Cir. 1999). That presumption "can be overridden only if . . . there is good cause for sealing a part or the whole of the record in that case." Id. (citations omitted). See also Civil L.R. 79(d)(3). In the case of medical records, there must be good cause to restrict the medical records. Bond v. Utreras, 585 F.3d 1061, 1074 (7th Cir. 2009). Restricting medical records is appropriate where "a plaintiff's interest in privacy outweighs the probative value of the information contained in the records." Matthews v. Waukesha Cty., No. 10-cv-440, 2012 WL 695669 at *12 (E.D. Wis. March 1, 2012) (citing Doe v. Oberweis Dairy, 456 F.3d 704, 718 (7th Cir. 2006)).

The defendants, not the plaintiff, have asked this court to restrict the plaintiff's medical records. The defendants have done this "to err on the side of caution when it comes to disclosure to the public-at-large of what might be considered otherwise-protected information" Dkt. No. 172 at 3. The plaintiff opposes the defendants' motion; he does not want any of his medical records restricted.[1] Dkt. No. 186 at 1-2. The defendants did not certify that they

---

[1] The plaintiff perceives that the defendants are trying to "hide" their alleged violations of his rights. The court notes that it is very common for *plaintiffs* to ask the court to restrict from public view—so that only the parties and the court may see—their medical records. Lots of people consider their medical histories private information and they would prefer that everyone in the world not be able to see that they had hemorrhoids or gastric bypass surgery or that they take medication for schizophrenia. The court suspects the defendants were doing nothing more than assuming that the plaintiff would want his private medical records kept . . . private.

3

conferred with the plaintiff before filing their motion, as the Local Rules require. See Civil L.R. 79(d)(4). The court will deny the defendants' motion.

## II.  Motion for Summary Judgment (Dkt. No. 173)

### A.  Facts

The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

The plaintiff was confined at the Milwaukee County Jail from July 12, 2012 to October 28, 2013. Dkt. No. 175-1 at ¶¶1-2. Defendants Marlon Hannah, Michael Ninkovic, Michael Huber and Jacob Gennrich worked for the Milwaukee County Sheriff's Office as correctional officers at the jail at the time of the events described in the amended complaint. Id. at ¶¶5, 7, 8, 9. The defendants were members of the Corrections Emergency Response Team ("CERT"), a group of officers who receive special training in deescalating and diffusing situations that may otherwise be volatile and/or pose security concerns. Id. at ¶¶5-9. These officers receive training in dealing with disruptive and combative inmates, managing use-of-force scenarios and the importance of writing reports. Id. at ¶¶6, 10-11.

On February 6, 2013, the plaintiff was on suicide watch, housed in Cell 38, located in subpod D of pod 4D. Id. at ¶12. An inmate must be placed on, and removed from, suicide watch status by a psychiatric health care provider. Id. at ¶13. Once on suicide watch, corrections staff check on the inmate every fifteen minutes "to ensure the inmate is alive and well." Id. The jail's pod 4D unit contains individual, single cells and the layout provides corrections

4

officers and medical staff with the ability to closely monitor inmates on suicide watch. Id. at ¶14.

While confined at the jail, the plaintiff spent a lot of time on suicide watch because, as he put it, he was "really depressed," "overwhelmed" and on "an emotional rollercoaster". Id. at ¶16. The plaintiff often verbally disrespected jail staff and engaged in attention-seeking behavior in a disruptive, unpredictable way. Id. at ¶18. The plaintiff had a documented history of violating rules and disrespecting staff. Id. at ¶19. While confined in the jail, the plaintiff received five major jail rule violations and thirteen in-pod minor jail rule violations. Id. at ¶20. Ten of the plaintiff's thirteen in-pod jail rule violations occurred prior to February 6, 2013 and those violations largely consisted of disrespecting officers and refusing to obey commands. Id. at ¶21.

On February 6, 2013, CERT team members received a "10-90" call, meaning that they needed to wear full gear, which consisted of helmets, chest and shoulder pads which blocked the officers' nametags, knee guards and arm guards which went from wrists to elbows, and gas masks which only left the officers' eyes visible. Id. at ¶25. At about 4:26 p.m., the CERT team—consisting of defendants Ninkovic, Hannah, Huber and Gennrich, as well as non-defendants Lacy Perleberg (n/k/a Garey), Anthony Arndt and Darren Reaves—responded to pod 4D to conduct a "shakedown" of the pod allegedly due to inmates (other than the plaintiff) who had manipulated and damaged sprinkler heads. Id. at ¶26. The safety of jail inmates and staff is compromised if inmates possess the small metal parts that fall out when inmates disassemble the fire

alarm system. Id. at ¶28. During a pod "shakedown," jail staff search each individual cell and each inmate with the goal of confiscating all contraband that might be present in the pod or on the inmates, and ensuring the functionality of all fixtures inside the cells. Id. at ¶27. CERT officers remove difficult inmates from cells because of their training in handling difficult behavior inmates. Id. at ¶29.

The shakedown of the plaintiff's sub-pod began at 4:38 p.m. and concluded by 5:10 p.m. Id. at ¶30. The documentation from the shakedown indicates that staff used OC spray on two inmates, but not the plaintiff. Id. at ¶31. Officers Hannah, Huber, Ninkovic and Gennrich do not recall any incident during the shakedown in which, as the plaintiff alleges, he suffered an injury. Id. at ¶32. Corrections officers did not document any incident with the plaintiff, such as the one he describes in his amended complaint, arising out of the February 6, 2013 cell shakedown. Id. at ¶33. In his amended complaint, the plaintiff alleges that

> On February 6, 2013, while on suicide watch, the CERT Team for MCCJF was doing a cell search. After the search, I was getting restraints removed as C.O. Hannah was removing them 3 other C.O.'s snatched the RIPP belt pulling me into the food shute [sic] up to my chest. As they held the belt, the handcuffs cut into my wrist. C.O. Hannah again started to remove the cuffs and when he did my wrist was bleeding and my forearms where [sic] scratched up and scarred. I then asked for medical attention and was denied. Later that nite [sic] Nurse Vicki examined me while passing out meds.

Id. at ¶34.

According to plaintiff's deposition testimony, his removal from his cell began when Officer Hannah ordered him to put his hands through his food

6

chute so he could be placed in restraints to conduct a search of his cell. Id. at

¶37. At first, instead of immediately complying with Hannah's order, the

plaintiff asked to have his cell water turned back on. Id. When inmates tamper

with the sprinkler system, cells in the pod flood and the water must be turned

off to prevent further damage. Id. at ¶38. After Hannah asked a second time,

the plaintiff complied and put his hands through his food chute so he could be

handcuffed and removed from his cell. Id. at ¶39; Dkt. No. 188 at ¶39. As

Hannah handcuffed the plaintiff, he double-locked the cuffs so that the wrist

portion of the cuff could not tighten on the plaintiff's wrist. Dkt. No. 175-1 at

¶40. According to the plaintiff's recollection, once handcuffed, he pulled the

RIPP restraint belt into his cell through his cell's food chute door, the officers

opened his cell door and attached the unconnected side of the tether to his cell

door, officers spun the plaintiff around and escorted him out of his cell

backwards and officers attached the RIPP restraint belt to his waist, which was

attached to the connected piece of the tether. Id. at ¶42. A tether is a black

fabric device that is approximately fifteen inches in length and has one D-

shaped ring that is connected to the RIPP belt that gets attached to an inmate's

waist, and another D-shaped ring that gets connected to an inmate's cell door

to limit mobility as an inmate is taken out of his cell. Id. at ¶56.

The plaintiff says that while officers escorted him out of his cell, he called

the CERT officers "a bunch of sadistic SOBs," while also using other

profanities. Id. at ¶43. Although not entirely sure of the officers' identifications,

the plaintiff thinks Officers Hannah and Huber escorted him out of his cell and

placed him outside of his cell door, and that Officer Gennrich stabilized the plaintiff's legs during the "wall stabilization."[2] Id. at ¶¶45-47. The plaintiff concedes that the officers who initially stabilized him against the cell door did not use force. Id. at ¶48.

The plaintiff testified in his deposition that, while stabilized against the cell door, he was "complaining and talking stuff," and using profanity toward the officers. Id. at ¶49. While the plaintiff did this, Officer Ninkovic grabbed him by the back of the head and pushed his head to the cell door for ten to fifteen seconds. Id. at ¶50. During the ten to fifteen seconds Ninkovic had the plaintiff's head pushed into the door, the plaintiff "tr[ied] to move [his] head away from the door and [Ninkovic] began to squeeze more[.]" Id. at ¶51. The plaintiff claims to have been choked during the head stabilization, and he also states he laughed and spoke with/cussed at the officers during the alleged choke, and was "cussing . . . out using all kind of profanity" "the big guy," whom the plaintiff believes is Ninkovic, and telling him to "go F yourself" and calling him a "coward, racist, sorry piece of garbage." Id. at ¶54.

The defendants describe Officer Ninkovic's actions as a "head stabilization." Id. "Head stabilization" is a technique when an officer secures

---

[2] According to the defendants, "wall stabilization" is a trained technique where corrections staff attempt to prevent an inmate from resisting in an effort to maintain the security and control of the jail. Id. at ¶52. Wall stabilization of inmates already handcuffed, as was the case with the plaintiff, involves at least one officer on each side of the inmate, securing each leg because the inmate's arms are already cuffed and secured. Id. During this stabilization, an officer locks elbows with the inmate and places his knee and thigh between the inmate's leg, with the goal of keeping the inmate's leg secured against the wall. Id.

8

inmate's head against the wall, with the inmate's head turned to either side. Id. at ¶53. Typically both hands of the officer are in the shape of a diamond, with the opening of the diamond over the inmate's ear; the officer securely grips the head to prevent the inmate from being able to move his head, to prevent the inmate from harming himself or others and to prevent the inmate himself from slamming his head into the wall. Id.

In his declaration, the plaintiff says that he "did not offer any physical resistance before the defendant Ninkovic used a chkoe [sic] hold and slammed [his] head into the door, on February 6, 2013." Dkt. No. 189 at ¶39. He asserts that while he was very "vocal," he never acted out in a physical or threatening manner. Id. at ¶37.

Officers did not discover contraband during the search of the plaintiff's cell. Id. at ¶55. After the search, staff escorted the plaintiff back into his cell and told him to place his hands through his food chute again after the RIPP belt had been detached from his waist and was connected only to the tether. Dkt. No. 175-1 at ¶55. The plaintiff claims that while Officer Hannah was removing the handcuffs from the plaintiff (while the plaintiff was inside of his cell and had his arms through the food chute, still attached to the RIPP restraint belt at the handcuffs as opposed to secured around his waist), Officers Ninkovic, Huber and Gennrich "grabbed the RIPP belt and fell back with that weight," pulling the plaintiff's arms through the chute, cutting his right wrist on the handcuffs and scratching his left wrist and forearm. Id. at ¶57. The plaintiff testified that he was bleeding, that he asked Hannah to "get a

nurse for [him]" to receive medical treatment and Hannah told the plaintiff he

would. Id. at ¶58. The plaintiff testified that he met with Nurse Vicki after he

asked Hannah for medical attention. Id. at ¶59. The plaintiff testified that he

requested medical attention from Huber that evening when Huber conducted

rounds on the unit, and that Huber stated that "he would call somebody." Id.

at ¶61. The plaintiff concedes he did not ask Gennrich or Ninkovic for medical

attention. Id. at ¶62.

"Med pass" in pod 4D occurred three to four times per day, at which time

the plaintiff could address the medical staff to voice his medical complaints. Id.

at ¶67. The plaintiff testified that he complained to medical staff the evening of

February 6, 2013 and staff told him to complete a "pink and white" slip

directed to medical personnel to receive medical attention. Id. at ¶68. The

plaintiff claims to have also asked Officer Huber for assistance in filling out a

"pink and white." Id. at ¶69. Huber had familiarity with the plaintiff from

working in the pod 4D housing unit. Id. at ¶70. Had Huber been aware that the

plaintiff claimed he had an injury, he would have reported that injury to his

superior officer and medical staff so that proper follow-up could occur. Id. at

¶71. If there had been an urgent need for medical attention, Huber would have

called a medical emergency. Id.

As a result of the head stabilization by Officer Ninkovic, the plaintiff

states he received a busted lip and a swollen neck. Id. at ¶75. As a result of the

CERT officers allegedly pulling the tether through the food chute while still

attached to the plaintiff's RIPP restraint belt, he claims to have suffered a one-

inch gash on his right wrist, a sore wrist, scratches and scrapes and "numb and tingling" fingers. Id. at ¶76. The plaintiff testified that he also experiences numbness related to a March 29, 2013 incident unrelated to the allegations in his amended complaint. Id. at ¶80.

On February 7, 2013, the plaintiff met with RN Chris Lubus, at which time the plaintiff told her that "the big officer grabbed me by the neck, from behind, and choked me . . . the big guy pulled my arms forward thru [sic] the chute and my skin got all cut up." Id. at ¶85. Lubus made the following objective findings during this encounter: that the plaintiff was " . . . in no apparent distress. Presents as mildly agitated and angry. Bilateral inner forearms have superficial abrasions on them; no bleeding noted. Neck does not appear swollen." The plan was "no wound care needed . . . ." Id. at ¶86.

That same day, the plaintiff met with a nurse practitioner, who noted that the plaintiff stated, "I got beat up last night." Id. at ¶87. The practitioner also stated, "[The plaintiff] also reports resisting officers while being placed back in cell." Id. at ¶87. The objective findings noted: "he continues to have poor judgment and insight re: cause/effect of behavior. Poor impulse control, poor anger management." Id.

Later in the evening on February 7, 2013, RN Electisa Spears saw the plaintiff and noted that the plaintiff "does not appear to be in any distress." Id. at ¶88.

The medical record includes two written requests submitted to medical, one entered in the medical record on February 8 and one entered on February

11

10, both referring to the plaintiff's request to be seen regarding his scrapes and abrasions. Id. at ¶91.

On February 10, 2013, RN Gregory Barilla saw the plaintiff and made objective findings that there was "no sign of any swelling or bruising to wrists." Id. at ¶93.

On February 11, 2013, RN Lubus saw the plaintiff. Id. at ¶95.[3] Her objective findings note in part, "[r]ed marks and indentations noted on right inner wrist at thumb base." Id. That same day, RN Floria Hill saw the plaintiff related to his complaints of left wrist pain, at which time she noted "[n]o injury was noted on the Lt. wrist." Id. at ¶96.[4]

On February 12, 2013, RN Hill again saw the plaintiff, at which time her subjective notes state as follows: "Inmate stated 'I don't have any feeling in my thumb, I got all there [sic] bruises from the chute.'"[5] Id. at ¶98. The objective findings note, "[i]nmate showed writer dark colored marks on his wrists where

---

[3] The plaintiff states that he has no knowledge of being seen by RN Lubus on February 11, 2013, and states that RN Lubus did not treat him. Dkt. No. 188 at ¶95.

[4] The plaintiff denies that he met with RN Hill and that Hill treated his injuries. Dkt. No. 188 at ¶96. He references Exhibit 1011 and states "no co-pay." Id. Presumably, the plaintiff assumes that the lack of a co-pay shows that he did not receive medical treatment that day.

[5] The plaintiff denies that RN Hill saw him that day "as he had not been treated or diagnosed by any of the RN's and had not filed a pink and white or paid the co-pay for the visit." Dkt. No. 188 at ¶98. These facts do not mandate the conclusion that he did not receive medical treatment on February 12, 2013.

12

he said they got injured on the door chute. However, writer was unable to

determine if they were old or new, areas appears [sic] to be old." Id.

B.    Analysis

1.    *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir.

2011). "Material facts" are those under the applicable substantive law that

"might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A

dispute over "material fact" is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must

support the assertion by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of
> the motion only), admissions, interrogatory answers, or other
> materials; or

> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a

motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

> 2. *Discussion*
>> a. Excessive Force Claim

The defendants assert that there is no "contemporaneous documentation" of an incident such as the one the plaintiff describes in the amended complaint. Dkt. No. 174-1 at 16. They assert that "there was no use-of-force action." Id. They say that "[n]o physical struggle, use of force, or injury involving [the plaintiff] occurred on February 6, 2013 (or at any other time)." Id. at 17. They say that if such an incident had occurred, or if the defendants had witnessed such an incident, they would have documented it, but there is no documentation. Id. They emphasize that there is no documentation from the *plaintiff* that such an incident occurred—no grievance, no record of the plaintiff seeking medical attention. Id.

The defendants also contend that the undisputed facts undermine the plaintiff's allegations and, when considered in their totality, show that his excessive force claim lacks merit. Id. at 18. Specifically, the defendants state that the plaintiff admitted that he was disrespectful, noncompliant and resistant during the search. Id. at 19. The defendants also contend that the plaintiff suffered *de minimus* injury or injury that cannot be connected to his allegations of a February 6, 2013 incident. Id. at 20. According to the defendants, "the absence of non-conflicting and credible evidence from [the plaintiff] regarding the nature, diagnosis or cause of those claimed physical

14

injuries further indicates that no reasonable fact finder could credit the version of events in his amended complaint." Id. at 22. The defendants also contend that the plaintiff presented a security issue that required the officers to stabilize him against the wall and to stabilize his head. Id. at 22-23. The defendants assert that three CERT officers in full riot gear could not have fit in the small area by the food chute, pulled and "fall[en] back with that weight" as the plaintiff claims, nor could they have used the RIPP belt or the tether to exert their full weight because it is not long enough. Id. at 23-24. The defendants also contend that if events had transpired as the plaintiff asserts, his arm likely would have been broken, which did not happen. Id. at 24.

The plaintiff responds that he can establish that the defendants used excessive force that led to severe injuries. Dkt. No. 187 at 9. He denies admitting that he resisted during the cell search, although he acknowledges that he was "very vocal about the treatment he was receiving" and that he "did use profanity as a form of communication[.]" Id. at 10. The plaintiff contends that Officer Ninkovic did not have cause to slam his head into the door and choke him. Id. He says this caused a bloody lip, scratches and swelling to his neck. Id. at 12. The plaintiff states that placing a suicidal pretrial detainee like himself in restraints violated jail policy and that he did not threaten himself or anyone else. Id. He also contends that Officers Ninkovic, Gennrich and Huber used excessive force when they grabbed the RIPP belt and "lanyard" (presumably he means the tether) and fell back using their combined weight.

The plaintiff contends that he suffered "lifelong injuries" because of the excessive use of force and that he did not present a security issue. Id. at 12-13.

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389, 397-98 (2015) (quoting Graham v. Connor, 490 U.S. 385, 395, n.10 (1989)). In deciding whether the force used against a pretrial detainee is excessive, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. at 396-97. Objective reasonableness turns on the "facts and circumstances of each particular case[,] and the court should make this determination from the perspective of a reasonable officer on the scene and "not with the 20/20 vision of hindsight." Id. at 397 (citing Graham, 490 U.S. at 396). The court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained" and should appropriately defer to policies and practices that jail officials decide "are needed to preserve internal order and discipline and to maintain institutional security." Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540 (1979)). The following considerations may bear on the reasonableness or unreasonableness of the force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. (citing Graham, 490 U.S. at 396).

16

The court first examines whether a reasonable factfinder could conclude that Officer Ninkovic's alleged actions holding the plaintiff's head against the wall for ten to fifteen seconds constituted excessive force. Ninkovic says that he does not recall the plaintiff. Dkt. No. 177 at ¶7. In his deposition, the plaintiff testified more than once about the "big guy" who pushed his head to the wall and squeezed his neck. The plaintiff asserts that he did not physically resist or act in a threatening manner toward anyone, but he concedes that after staff escorted him out of his cell, he continued to complain about the officers' conduct and to swear at them. He testified that after Officers Hannah and Huber escorted him from his cell, officers stabilized him (without force) against the door. Dkt. No. 184-2 at 20, 71:6-7.

At this time, the plaintiff was handcuffed, Hannah and Huber stood on either side of him with each holding one arm and Officer Gennrich stood behind him with his hand on the plaintiff's back and his foot between his legs. Id., 71:9-13. The plaintiff questioned what the officers were doing and why they were doing it. Id., 69:9-19. Hannah told the plaintiff, "Well, Mr. Brown, that's just our policies. You know, just be patient." Id., 70:6-7. The plaintiff testified that he did not listen to Hannah and that he continued to talk and to call them, "SOBs and sad, sorry individuals, what they did[.]" Id. at 70:14-19. Ninkovic told the plaintiff to "shut up, and I didn't. I said: What you going to do, make me shut up? I'd like to see you try. Yeah." Id. at 70: 20-23. The plaintiff testified:

> Like I said, I was saying what I said and the big guy came over and
> I felt something on the back of my neck. I felt him grab the back of

17

> my neck and my head went into the door. And when it did, I turned around and I started cussing him out. Started cussing him out using all kind of profanity and told him, you know, to go F yourself. He was chocking [sic] me and I wouldn't shut up, so that's what happened.
>
> But I didn't use any profanity towards him or direct anything towards him until after he slammed me into that door as far as talking to him.

Id., 71: 14-22; 72 at 1. The plaintiff testified, "My head was pushed against the door, I guess, the entire time that I was—maybe for about 10 or 15 seconds. I then began to try to move my head away from the door and he began to squeeze more and—yeah." Id., 72: 20-24. He testified that Ninkovic "started squeezing [his] neck," and that when the plaintiff tried to move his head, Ninkovic "increased" the pressure on his neck. Id. at 72:14-15, 22-23; 73:1-4. The plaintiff testified that he made the statement, "What are you trying to do, kill me? Hell, I tried to kill myself, you're just helping me out." Id. at 73:6-8. After that, Ninkovic "kind of let go and he just stepped back. They put me back in the cell, but I was—I still was cussing at him. I call him a coward, racist, sorry piece of garbage." Id. at 73: 13-16.

There is no dispute that the defendants conducted a cell "shakedown" to search all inmates and all cells in pod 4D after inmates damaged sprinkler heads. Despite the plaintiff's suicide watch status, staff considered him a "difficult" inmate based on his conduct history and during cell shakedowns, staff remove difficult inmates from their cells. The plaintiff acknowledges that he did not follow directions to be patient and to "shut up;" he continued to talk, swear, cuss and use profanity toward the officers while they had him stabilized

at the wall. While in some places the plaintiff says that Ninkovic pushed his head against the wall, in others he states that Ninkovic "slammed" his head against the wall. The plaintiff says that when this happened, the plaintiff "turned around and started cussing him out" at which time Ninkovic began to squeeze more, increasing the pressure on the plaintiff's neck. After a few seconds, Ninkovic let go and stepped back.

The defendants assert that they—including Ninkovic—could not have used excessive force because there is no record of a "use-of-force" incident. They indicate that had there been such an incident, they would have recorded it in the jail log and in Ninkovic's daybook. Dkt. No. 195 at 3-4. The court cannot conclude that the fact that the defendants did not treat the incident as a "use-of-force" incident does not mean that Ninkovic may not have used force. This is not a circumstance in which there is a video contradicting the version of events that the plaintiff describes, or contemporaneous reports that contradict his version; it is the plaintiff's word—that Ninkovic "slammed" the plaintiff's head into the wall and "choked" him, giving him a bloody lip—against the defendants'—that the plaintiff would have had his head stabilized against the wall using a trained technique.

The defendants assert that the plaintiff's own deposition testimony that he tried to move his head while his head was being stabilized was "a form of physical resistance that poses a security risk to the officer and to [the plaintiff] himself, because [the plaintiff] could slam his head against the door." Dkt. No. 195 at 6. They argue that that this resistance would justify the use of the head

19

stabilization technique they described in their proposed findings of fact. Id. They assert that the plaintiff's description of the head stabilization as a "choke" is belied by his testimony that he was speaking with—and swearing at— officers. Id. at 7. These are disputes of fact. A reasonable trier of fact could credit the plaintiff's testimony that rather than his head being pushed into the wall for a few seconds, Ninkovic "slammed" his head into the wall and squeezed his neck sufficiently to cut of his breathing. A reasonable trier of fact could conclude that that force was excessive in response to an inmate moving his head while being stabilized.

It is true that the plaintiff did not mention this incident in the complaint, and while he says he had a swollen neck and a bloody lip, the nurse did not notice any swelling the next day. It also is true that the record contains no documentation of the plaintiff reporting this injury to medical staff or being treated for a bloody lip. It does appear, however, that the plaintiff reported *something* to the medical staff; the defendants' proposed findings of fact indicate that the nurse's notes from the day following the event stated that the plaintiff's bilateral forearms had superficial abrasions on them and that his neck did not appear swollen, implying that he told the medical staff that something had happened to his neck. Dkt. No. 175-1 at ¶86.

The questions of whether the events unfolded as the plaintiff claims, and if so, whether the amount of force Ninkovic used was reasonable and whether any injury the plaintiff suffered was *de minimis*, are questions for the trier of

fact. The court will deny the defendants' motion for summary judgment on this claim.

The second potential use of force incident involves Officers Ninkovic, Huber and Gennrich allegedly pulling the plaintiff's RIPP belt or tether through the food chute. The plaintiff had been returned to his cell handcuffed still connected to the RIPP belt and tether. According to the plaintiff, when he placed his hands in the chute to be uncuffed, Ninkovic, Huber and Gennrich "grabbed the RIPP belt and fell back with that weight," pulling the plaintiff's arms through the chute and cutting his right wrist on the handcuffs and scratching his left wrist and forearm. The parties dispute whether this occurred. The defendants contend that it could not have occurred, based on the amount of space available in front of the plaintiff's cell. The court cannot make that determination on this record. The parties tell different versions of this incident and a reasonable factfinder could believe the plaintiff's version, which would support an excessive force claim given that the plaintiff presented no apparent security risk at this point. The court cannot resolve the factual dispute regarding the plaintiff's excessive force claim against Ninkovic, Huber and Gennrich—a jury must do so.

b. Medical Care Claim

The defendants contend that they did not fail to obtain medical treatment for the plaintiff and therefore did not violate his constitutional rights. Dkt. No. 174-1 at 26. They assert that the plaintiff acknowledges that he did not ask Officers Gennrich or Ninkovic for care, and that his deposition testimony belies

21

his claim that Officers Hannah and Huber ignored his need for medical attention. Id. According to the defendants, the plaintiff says he asked Hannah for medical attention, Hannah said he would do what he could and the plaintiff saw a nurse the day of the incident. Id. The defendants also state that the plaintiff says he asked Huber for medical attention during rounds; they assert that Huber would have notified his superior and medical staff if he knew the plaintiff had an injury, and that he would have summoned medical personnel for an emergency. Id. at 26-27.

The plaintiff contends that he was deprived a medical attention for his serious injuries. Dkt. No. 187 at 19. He says that he did not receive medical attention for several days "as to the diagnoses and treatment of his injuries." Id. at 19. The plaintiff states that he submitted two "pink and whites" to get medical care after the incident and that when he was seen on February 10, 2013, the nurse practitioner said he had suffered nerve damage and might need an MRI. Id. She scheduled the plaintiff for a four-to-six week follow up. Id. The plaintiff says that on June 6, 2013, he was placed on pain medication and issued sprints for his wrist. Id.

A §1983 claim that a pretrial detainee received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. James v. Hale, 959 F.3d 307, 318 (7th Cir. 2020) (citing Miranda v. Cty. of Lake, 900 F.3d 335, 346-47 (7th Cir. 2018)). The court applies an objective-reasonableness standard to claims of inadequate medical care while in pretrial detention. Id. (citing Miranda, 900 F.3d at 352). The

plaintiff bears the burden of demonstrating objective unreasonableness, and he must make a twofold showing. First, he must show that the defendant acted purposefully, knowingly or recklessly when considering the consequences of his response to the medical condition at issue in the case. Id. (citing McCann v. Ogle Cty., Ill., 909 F.3d 881, 886 (7th Cir. 2013)). Second, the plaintiff must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. Id. (citing McCann, 909 F.3d at 886).

The plaintiff is not making a deficient medical care claim against Officers Gennrich and Ninkovic; he concedes that he did not ask them for medical attention. Dkt. No. 175-1 at ¶62.

Regarding Officers Hannah and Huber, the plaintiff cannot show that they acted with objective unreasonableness. The plaintiff acknowledges that after the incident, he asked Hannah to get a nurse, Hannah said he would and the plaintiff later met with Nurse Vicki. The plaintiff says that Nurse Vicki did not actually examine or treat him, but he does not allege that Hannah was responsible for that.

The plaintiff also states that on the evening of the incident he asked Officer Huber for medical attention and that Huber stated that he would call somebody. The record shows that nursing staff saw the plaintiff three separate times on February 7, 2013. In addition, based on the plaintiff's suicide watch status, staff checked on him almost 100 times per day in the days following the incident. Dkt. No. 172-1 at ¶¶84, 89, 90, 92, 94, 97, 99. Huber said he would

23

have called medical staff for an emergency if the plaintiff had an urgent need for medical attention. The record does not support a finding that the plaintiff required emergency medical attention. The plaintiff cannot show that either Huber or Hannah failed to relay his requests for medical care or deprived him of medical care. A reasonable factfinder could not conclude that Hannah or Huber deprived the plaintiff of medical attention and the court will grant the defendants' motion for summary judgment as to the plaintiff's medical care claim.

c. Qualified Immunity Regarding the Plaintiff's Excessive Force Claim Against Officers Ninkovich, Huber and Gennrich

The defendants contend that they are entitled to qualified immunity. Dkt. No. 174-1 at 28-29. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity on a motion for summary judgment turns on whether the plaintiff has both "(1) alleged that the official committed acts violating a clearly established right and (2) adduced 'evidence sufficient to create a genuine issue as to whether the [official] in fact committed those acts.'" Balsewicz v. Pawlyk, 963 F.3d 650, 656 (7th Cir. 2020) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

The court has determined that a factual dispute precludes summary judgment on the plaintiff's excessive force claim against Officer Ninkovic for the head stabilization/slamming/choking incident and against Officers Ninkovic,

Huber and Gennrich for the RIPP belt incident. The court needs only to determine whether the officers had fair notice that their alleged conduct was unlawful. Id. at 656-57. "[I]f applying the law at that time to the facts 'would have left objectively reasonable officials in a state of uncertainty,' then immunity is appropriate." Id. at 657 (quoting Horshaw v. Casper, 910 F.3d 1027, 1030 (7th Cir. 2018)).

In 2013, courts applied an excessive force standard to pretrial detainees more akin to the Eighth Amendment standard that applies to convicted prisoners. Under that standard, a plaintiff must allege that a defendant applied force maliciously and sadistically to cause harm rather than in a good faith attempt to maintain or restore discipline. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 668 (7th Cir. 2012).

The defendants contend that qualified immunity should apply to the plaintiff's excessive force claim against Officer Ninkovic related to pushing the plaintiff's head against the wall because the plaintiff conceded that "he was actively resisting a repeated command from a corrections officer to stop behaving in a dangerous manner." Dkt. No. 174-1 at 29. But the plaintiff has not conceded that he was actively resisting—he denies it, and the defendants are the one who characterize his testimony that he moved his head as "resisting." Further, this reasoning does not apply to the plaintiff's excessive force claim against Ninkovic, Huber and Gennrich because the plaintiff had been placed back in his cell and the record does not support a finding that the plaintiff actively resisted commands that time. A reasonable officer would have

25

known that slamming someone's head into a wall and choking him—if that is
what Ninkovic did—would have been unlawful (particularly absent vigorous,
active physical resistance). Reasonable officers would have known that
grabbing the tether and RIPP belt attached the plaintiff's handcuffs and falling
back with their body weight to forcefully pull the plaintiff's hands and arms
through the chute was unlawful. The plaintiff's excessive force claims against
Ninkovic, and his excessive force claim against Huber and Gennrich, survive
summary judgment.

## IV. Miscellaneous Motions

This case has been pending since February 2016—five years. Before the
COVID-19 pandemic hit in March 2020, this court had a packed docket and a
backlog of cases that needed addressing. Later that spring, a new magistrate
judge joined the court, Judge Stephen C. Dries, who offered to assist in
addressing that backlog if parties were willing to consent to his authority to
decide their cases. Accordingly, on June 30, 2020, the clerk of court advised
the parties that they had the option to consent to Magistrate Judge Dries
adjudicating the case and noting that unlike Judge Pepper, Judge Dries did not
have a backlog of cases. Dkt. No. 168. The letter advised the parties that they
should return the magistrate consent forms within fourteen days—by mid-
July—if they were willing to consent to Judge Dries adjudicating the case. Id.

The court received the plaintiff's consent form on July 3, 2020. Dkt. No.
169. While the clerk's office dockets those forms, the judges are not able to
view them; the parties should be free to make their decisions about whether to

consent without worrying that the district court judge may be offended. So Judge Pepper cannot view the plaintiff's consent form. The defendants did not return the consent form.

On September 16, 2020—about a week after the court received the plaintiff's opposition materials to the motion for summary judgment, and about a week before the defendants filed their reply brief—the plaintiff filed a motion asking the court to schedule a videoconference. Dkt. No. 193. He stated that he had not received a "ruling" for a magistrate judge to preside over the case and indicated that he had not gotten confirmation that the court had received his opposition materials. Id. He asked the court to schedule a videoconference to answer his questions about these issues. Id.

The court will deny this motion as moot. There is nothing for the court to "rule" on regarding the magistrate judge. Magistrate Judge Dries cannot adjudicate a case unless all parties consent. The court did not receive a magistrate consent form from the defendants within fourteen days after the June 30, 2020 letter the clerk sent out. So whether the plaintiff consented or not, the case could not be reassigned to Judge Dries because the court did not receive consent from the defendants. As for the plaintiff's opposition materials, the court received them on September 8, 2020—dkt. nos. 186-189, September 10, 2020—dkt. no. 190, and September 14, 2020—dkt. no. 191. The court has considered those filings in ruling on the summary judgment motion.

On December 28, 2020, the plaintiff asked for the status of his case, asking in particular whether Judge Pepper continued to preside over the case

and the status of his request for a video conference. Dkt. No. 199. The court grants that motion—it has provided the information the plaintiff requested. Judge Pepper continues to preside over the case because the defendants have not submitted a form consenting to Magistrate Judge Dries deciding the case, and the court has denied the plaintiff's motion for a video conference.

Finally, on January 25, 2021, the court received from the plaintiff a request that the clerk of court enter default. Dkt. No. 200. He cites Fed. R. Civ. P. 55, and argues that the defendants have "failed to respond" by submitting unsigned declarations from each of the defendants. Id. at 1. The plaintiff also asserts that this court "forced" him to proceed on claims of excessive force and deliberate indifference. Id. at 2.

The court will deny the plaintiff's request for the clerk to enter default. The plaintiff is alleging that the defendants' declarations were deficient because he perceives they were not signed. Rule 55 applies where a defendant fails to respond to a plaintiff's request for a judgment for affirmative relief—a *complaint*. The defendants responded to the plaintiff's amended complaint at Dkt. Nos. 25, 112 and 135. Default is not a remedy for an allegedly deficient filing—it is a remedy for the defendant's failure to respond to the lawsuit.

As for the plaintiff's claim that the defendants did not sign their declarations, the plaintiff is incorrect. The last page of each of the defendants' declarations has a signature line, and above the line the defendant's name appears, preceded by "s/." Dkt. No. 117 at 12 (Ninkovic), Dkt. No. 178 at 9 (Hannah), Dkt. No. 179 at 9 (Huber) and DKt. No. 180 at 9 (Gennrich). The

28

"s/Signatory Name" is the appropriate signing convention for efiled documents that require the signature of a non-attorney. Section II(C)(2) of the April 10, 2019 United States District Court for the Eastern District of Wisconsin Electronic Case Filing Policies and Procedures Manual requires the following:

> 2.　Non-Attorney Signature, Generally.
>
> 　　a.　If the original document requires the signature of a non-attorney, the filing attorney must:
>
> 　　　　(1)　obtain the signature of the non-attorney on the original document;
>
> 　　　　(2)　electronically file the document indicating the signatory in the following format: "s/Signatory Name";
>
> 　　　　(3)　maintain the original document in paper form until one year has passed after the time period for appeal expires; and
>
> 　　　　(4)　provide the original document for review upon request of the judge.

The declarations with the "s/Signatory Name" signature block comply with—in fact, were required by—this court's efiling procedures.

The court will deny the motion for entry of default. Dkt. No. 200.

## V.　Conclusion

The court **DENIES** the defendants' motion to restrict documents. Dkt. No. 172. The court **ORDERS** the Clerk of Court to make publicly available the documents at Docket Nos. 174-1, 175-1, 183-4, 183-10, 183-12 and 184-2.

The court **GRANTS** the defendants' motion for summary judgment as to the plaintiff's denial of medical care claim against Officers Hannah and Huber. Dkt. No. 173.

29

The court **DISMISSES** defendant Officer Marlon Hannah.

The court **DENIES** the defendants' motion for summary judgment as to the plaintiff's excessive force claim against Officer Ninkovic related to the head stabilization incident, and against Ninkovic, Huber and Gennrich related to pulling the plaintiff's arms through the food chute door. Dkt. No. 173.

The court **DENIES** the plaintiff's motion for a video conference. Dkt. No. 193.

The court **GRANTS** the plaintiff's motion for a status update. Dkt. No. 199.

The court **DENIES** the plaintiff's motion for entry of default. Dkt. No. 200.

The court **ORDERS** that the parties are to appear for a telephone status conference on **April 1, 2021 at 9:30 AM** to discuss next steps. The defendants' counsel should appear by calling the court's conference line at 888-557-8511 and entering access code 4893665#. The court has made arrangements with the Wisconsin Secure Program Facility and will call the plaintiff for the hearing.

Dated in Milwaukee, Wisconsin this 2nd day of March, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**